UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 28 2019 ★

BROOKLYN OFFICE

-----------------------------------------------------------x

RUBEN BELTRAN,

                Petitioner,

-against-

WILLIAM F. KEYSER, Superintendent,

                Respondent.

-----------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
15-CV-7201 (CBA)

**AMON, United States District Judge:**

On January 26, 2010, a jury convicted Petitioner Ruben Beltran in New York Supreme Court, Kings County, of two counts of first-degree course of sexual conduct against a child, one count of first-degree sexual abuse, and two counts of endangering the welfare of a child. (D.E. # 1 ("Petition") at 1.) Beltran was sentenced to two concurrent terms of imprisonment of twenty-five years on each first-degree course of sexual conduct count, to run consecutively with a term of imprisonment of seven years for the first-degree sexual abuse count. (D.E. # 9, Sentencing Tr. at 22–23.) Beltran was also sentenced to twenty years of post-release supervision. (Id.) Beltran filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Id.) Beltran has also requested an evidentiary hearing as to one of his fair trial claims. (See D.E. # 17.) For the following reasons, the Court denies his request for an evidentiary hearing and denies his petition for a writ of habeas corpus in its entirety.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★    MAY 23 2015    ★

BROOKLYN OFFICE

## BACKGROUND

The Court only recounts those facts relevant to the instant petition.

### A. Beltran's Trial and Conviction

In 2009, Beltran was indicted for committing sexual assault against two victims, V. and S.[1] (D.E. # 8 ("Dolan Aff.") ¶ 5.) The indictment charged Beltran for multiple acts committed against V., Beltran's niece, during the time period of June 1, 1998 to August 31, 2001, when V. was five to eight years old. (Id. ¶ 4.) It charged Beltran with a single act against S. that took place on March 12, 2008, when S. was five years old. (Id.)

Beltran was tried before a jury in the New York Supreme Court, Kings County, from Janauary 19, 2010 through January 26, 2010. (Id. ¶ 6; see also D.E. # 9 Ex. A ("Trial Tr.").) At trial, Beltran was represented by Edward Friedman. (Id.) Friedman had over 25 years of experience, primarily in criminal defense, and had tried approximately 100 felony cases, including cases involving sex crimes committed against children and adults. (Id. ¶ 16; see also D.E. # 9 Ex. C ("Friedman Aff.") ¶ 4.)

### 1. Accommodations for Beltran's hearing impairment

At a conference prior to trial, Friedman informed the trial court that Beltran had "a case of meningitis around 20 years ago" which caused "hearing loss" and that Beltran had problems hearing "even with the amplified speaker." (Trial Tr. at 4.) The trial judge observed that Beltran was not having trouble hearing him speak and that he was not using an amplified speaker. (Id.) Beltran stated that "As long as people talk in a very strong—I'm okay." (Id.) The trial court indicated it would "have the microphone on" for all testimony at trial, to which Beltran stated

---

[1] In light of New York Civil Rights Law § 50–b, which provides that the identities of the victims of sex offenses be kept confidential, the Court refers to the victims in this case by their first initials. See Lucidore v. New York State Div. of Parole, 209 F.3d 107, 109 n.4 (2d Cir. 2000).

"Okay." (Id.) The trial court also told Beltran to let it know if he had any problem hearing during the proceedings. (Id. at 5.) Throughout trial, the court instructed witnesses to speak into the microphone when Friedman indicated that Beltran could not hear the witness' testimony. (See, e.g., Trial Tr. M.: 52; V.: 155; Nayan: 293.)

On one occasion on the third day of trial, Friedman notified the trial court that Beltran had, upon reviewing the transcripts, realized that he did not fully comprehend the prior day's testimony. (Id. at 291.) Friedman noted that he would address the court if there were any further issues. (Id.) No subsequent applications were made. (Id.)

## 2. Proceedings related to conduct against V.

At trial, Jeanette Nascimento, V.'s mother and Beltran's sister-in-law, testified that Beltran and his wife babysat V. and her younger sister on a weekly basis when Nascimento and her husband were at work. (Trial Tr. Nascimento: 240.) Beltran often watched his nieces alone when his wife went to work. (Id.) V. testified that on numerous occasions between June 1, 1998 and August 31, 2001, Beltran sexually assaulted her. (Trial Tr. V.: 149–152.) During her testimony, she described specific incidents of sexual abuse and unconsented intercourse. (Id. at 149–161.) At the time, she did not disclose these incidents to her parents or other family members because she was scared. (Id. at 160–161; 182–184.) V. testified that, when she was in the third grade, she told one friend her same age about the abuse, and then did not tell anyone about it again until she was in the eighth grade. (Id. at 163.) On March 25, 2008, V.—now fifteen years old— told another friend that she was abused when she was younger. (Id.) This friend repeated it to other students at the school, and it was eventually disclosed to V.'s guidance counselor, who notified Nascimento and school safety officers. (Id. at 165.) Nascimento decided not to report the abuse to the police until the following day. (Trial Tr. Nascimento: 241–43.) During V.'s testimony, the prosecution

3

introduced two photographs into evidence—one of V. when she was five years old, and one of V. and her sister when V. was eight years old. (Trial Tr. V.: 168–70.)

On March 26, 2008, Nascimento and V. met with Police Officer Christopher Iannotti, who prepared a complaint report and referred the case to Detective David Kellner from the Special Victim's Squad. (Dolan Aff. ¶ 6-J.) Detective Kellner accompanied Nascimento and V. to Woodhull Hospital, where Dr. Lorne Nayan, an attending pediatrician with experience treating children with sexual abuse, conducted a gynecological examination. (Id. ¶ 6-K.) Dr. Nayan testified that when he conducted the examination, he observed four separate tears to V.'s hymen. (Trial Tr. Nayan: 301, 305.) In his opinion, these tears "were consistent with an adult penis being repeatedly inserted into a child's vagina," and likely were the result of "forceful genital penetration." (Id. at 302–03.) V. testified at trial that she had never had a gynecological examination before and that she had not had sexual intercourse with anyone other than Beltran. (Trial Tr. V.: 166, 186.) On cross-examination, Dr. Nayan admitted that he could not tell how old the tears were, and that it was possible that they could have happened as recently as a week before the examination. (Trial Tr. Nayan: 306.) Dr. Nayan also testified on cross that it was possible the tears could have occurred through consensual sexual encounters, and that he would have expected the tears to have caused some pain and bleeding, although bleeding does not always occur with the tearing of the hymen. (Id. at 307–310.)

The prosecution also called Dr. Donald Lewittes, a clinical psychologist who evaluates children when there are allegations of child abuse. (Trial Tr. Lewittes: 338.) Dr. Lewittes testified that there is a pattern exhibited by children who had been sexually abused by a family member, known as "child sex abuse syndrome," which has five stages: engagement, sexual interaction, secrecy, delayed disclosure, and suppression. (Id. at 346–60.) Dr. Lewittes explained that there

were many reasons why a child might not immediately disclose sexual abuse. (Id.) On cross-examination, Dr. Lewittes testified that victims appearing to suffer from child sex abuse syndrome could still be untruthful, and that young children were impressionable. (Id. at 372–76.) Friedman also elicited that there had been cases where suggestive interviewing of children had led to false allegations of child abuse. (Id. at 377–79.)

### 3. Proceedings related to conduct against S.

M. was the mother of four children, including six-year old S. (Trial Tr. M.: 47.) Beltran's wife was M.'s aunt, and M. testified that she often left her children at Beltran's residence when she and her husband were at work. (Id. at 51.) M. testified that on March 12, 2008, she brought her children to Beltran's residence. (Id. at 51.) Beltran's wife had to work that day, so M. left her children in Beltran's care. (Id. at 60.) S. testified that while her younger siblings were sleeping and S. was on the bed watching TV, Beltran sat down next to her and touched her vagina with his hand. (Trial Tr. S.: 216–217.) S. testified that after Beltran touched her, her vagina hurt. (Id. at 228.) M. testified that when she returned home, S. pointed to her vagina and said that Beltran had touched her there and that it hurt. (Trial Tr. M.: 52–54.) M. did not report the incident until several weeks later, on March 28, 2008. (Id. at 55–56; see also Dolan Aff. ¶ 6-S, 6-T.)

S. began her testimony from inside of the courtroom. However, when asked about what had happened to her, she became visibly distraught, cried, and could not calm down to answer questions. (Trial Tr. S.: 36.) After a recess, S. tried to resume her testimony, but was still too upset to answer questions. At that time, Friedman moved for a mistrial. (Id. at 42.) The trial court denied the motion, and instructed the prosecution to move on to another witness to give S. an opportunity to compose herself. (Id. at 43.) After taking the testimony of M., S. was still not capable of testifying. (Id. at 92.) The prosecution moved for S. to be declared a vulnerable witness

pursuant to New York Criminal Procedure Law ("N.Y. C.P.L.") Article 65, so that her testimony could be received via a live, simultaneous, two-way closed-circuit television feed. (Id. at 92.) The Court held a hearing on the issue, taking testimony from Melissa Livingston, a social worker at the Kings County DA's office. (Id. at 99.) Livingston testified that she had met with S. on at least five prior occasions, and concluded that it was her "professional assessment" that S. would "suffer severe mental or emotional harm by testifying in open court." (Trial Tr. Livingston: 114.) The trial court then stated that "from its vantage point on the bench approximately three feet from where [S.] was seated, it was clear that [she] was in severe emotional distress and appeared terrified." (Id. at 127.) It then determined that, while it was "mindful of the defendant's constitutional rights," "being in court is exceptionally traumatic for this young child and that she is suffering from severe, mental or emotional harm and is unable to testify," and that the "CPL authorized" S.'s testimony to be taken via a "two-way feed." (Id. at 127–28.) The next day, S. testified from a separate room via closed-captioned television. During her testimony, the people in the courtroom, including the jury and Beltran, were able to see S., and S. was able to see the people in the courtroom. (Id. at 128.)

During Friedman's cross-examination of M., he elicited from M. that Beltran had "molested" her when she was younger.[2] (Trial Tr. M.:61–62.) M. testified that despite this, she allowed Beltran to frequently babysit her children, because by that point she "wasn't thinking about [her] childhood . . . [she] left that behind." (Id. at 62.)

---

[2] M. subsequently explained on redirect that when she was ten or eleven, defendant had, "more than once," "touched [her] vagina, chest, and butt." (Trial Tr. M.: at 85–86.) She never told anyone about it because she was "ashamed." (Id.)

### 4. The Defense Case

Beltran testified on his own behalf at trial. (Trial Tr. Beltran: 394.) Beltran testified that he frequently had "confrontations" with his wife's family, including with her sister, Nascimento. (Id. at 402–403.) Beltran testified that while his wife often babysat for her nieces, he never watched them, and specifically was never alone with V. (Id. at 404, 411.) He further stated that when his wife had to go to work or leave the apartment to run errands, she always would take V. with her. (Id. at 446.) Beltran denied that he ever sexually assaulted V. (Id. at 443–44.)

Beltran testified that he often babysat for S. and her siblings. (Id. at 422–23.) On March 12, 2008, the date of the incident with S., Beltran stated that he picked S. up to lift her over his computer and dropped her due to a pain in his shoulder. (Id. at 430.) When he dropped S., her "crotch fell right on [his] kneecap, right on the bone." (Id.) Beltran testified that S. appeared to be in pain. (Id.) Beltran denied ever touching S. inappropriately or sexually. (Id. at 444.)

Beltran was the only witness presented during the defense's case. Friedman did not call Beltran's wife, nor did he call any medical experts to refute the testimony of Dr. Nayan or Dr. Lewittes.

On January 26, 2010, the jury convicted Beltran of two counts of first-degree course of sexual conduct against a child and one count of endangering the welfare of a child for the acts Beltran committed against V., and one count of first-degree sexual abuse and one count of endangering the welfare of a child for the incident involving S. (Trial Tr. at 578–79.)

### B. Post-Trial Procedural History

Prior to sentencing, Beltran filed a counseled motion to set aside the verdict pursuant to N.Y. C.P.L. § 330.30, arguing (1) Friedman was ineffective for: (a) failing to call an expert witness on child sexual abuse; (b) failing to call Beltran's wife as a witness; and (c) failing to request a

headset to assist Beltran with his hearing impairment; (2) the use of a closed-circuit television to facilitate S.'s testimony violated the Confrontation Clause; (3) the misdemeanor counts of endangering the welfare of a child were time-barred; and (4) the two counts of course of sexual conduct against a child in the first degree against V. were duplicitous. (See Dolan Aff. ¶¶ 9–13.) The trial court granted Beltran's § 330.30 motion solely on the ground that the misdemeanor counts of endangering the welfare of a child were time-barred. (Id.) The trial court then sentenced Beltran to concurrent terms of imprisonment of twenty-five years on each count of first-degree course of sexual conduct against a child relating to V., to run consecutively with a term of seven years for the first-degree sexual abuse count relating to S. (Id. ¶ 19.)

On December 3, 2010, Beltran filed a counseled motion pursuant to N.Y. C.P.L § 440.10 seeking to vacate his conviction because Friedman had rendered constitutionally ineffective assistance by failing to call expert witnesses to rebut the prosecution's expert witnesses—Dr. Nayan and Dr. Lewittes. (Dolan Aff. ¶ 13; D.E. # 9 Ex. B.) Beltran also argued that Friedman failed to effectively cross-examine Dr. Nayan and Dr. Lewittes, and that his wife should have been called to testify on his behalf. (Id.) The court conducted a hearing on November 4, 2011, where Friedman and Gary Medows, an expert that Friedman had consulted with prior to trial, testified. (D.E. # 9 Ex. D) Following the hearing, Beltran was granted leave to supplement the record with written statements from his proposed experts, a child psychologist and a pediatrician. (Id.)

On March 16, 2012, in an exhaustive analysis, the trial court ruled that Beltran failed to establish that Friedman had provided ineffective assistance of counsel. (D.E. # 9 Ex. H.) The trial court found that, after consulting with Medows, Friedman had made the reasonable decision to not engage in a "battle of the experts" to rebut the prosecution's case, but instead use cross-examination to elicit concessions from the prosecution's expert witnesses. (Id.) The trial court

also highlighted the shortcomings of Beltran's proposed experts who, at most, would have provided testimony to establish the same premises that Friedman adduced from Dr. Nayan and Dr. Lewittes on cross-examination. (Id.) The Appellate Division denied Beltran's leave to appeal the trial court's ruling on June 11, 2012. (Dolan Aff. ¶ 33.)

On June 8, 2011, Beltran filed a direct appeal of his conviction to the Appellate Division, Second Department. In this appeal, Beltran argued: (1) that he was denied a fair trial when the trial court refused to grant a mistrial after S. was unable to testify in open court; (2) that he was denied a fair trial when the trial court joined unrelated charges; (3) that the trial court's use of a closed-circuit television violated his Confrontation Clause rights; (4) that his second count of course of sexual conduct against a child in the first degree related to the conduct against V. was duplicative; and (5) that his sentence was excessive. (Dolan Aff. Ex. I.) Beltran then filed a pro se supplemental brief, which contained further grounds for appeal: (1) his trial counsel was ineffective for (a) failing to consult with or call a psychological expert; (b) failing to call a medical expert to challenge Dr. Nayan's testimony regarding penetration; (c) failing to consult or call an expert in the field of sexually transmitted diseases; (d) failing to make the court aware of the extent of his hearing impairment; (e) failing to call his wife as a defense witness; and (f) eliciting damaging testimony from M. regarding uncharged allegations of sexual assault; and (2) the use of an enlarged portrait that included V.'s sister deprived him of a fair trial. (D.E. # 9 Ex. K.)

The Appellate Division found that the second count of a course of sexual conduct against a child in the first degree was duplicative, and vacated the concurrent sentence imposed by the second count. See People v. Beltran, 110 A.D.3d 153, 162 (2nd Dep't 2013). It denied all other portions of Beltran's appeal. See id. In doing so, it conducted an extensive analysis of Beltran's Confrontation Clause claim and determined that the trial court "properly declared [S.] to be a

vulnerable witness," and that Beltran was not "deprive[d] of his federal and state constitutional right to confront the witnesses against him." Id. at 160–61. The Appellate Division further found that Beltran's ineffective assistance of counsel argument was not properly raised on direct appeal because it involved matters outside of the trial record, and that "his remaining contentions, including those raised in his pro se supplemental brief, [were] without merit." Id. at 163. The New York Court of Appeals denied leave to appeal on June 10, 2014. People v. Beltran, 16 N.E.3d 1280 (N.Y. 2014).

On September 3, 2014, Beltran, proceeding pro se, again moved to vacate his judgment of conviction pursuant to N.Y. C.P.L. § 440.10. (D.E. # 9 Ex. M.) Instead of challenging Friedman's ineffective assistance of counsel as he did in his first § 440.10 motion, Beltran argued that the prosecutor engaged in misconduct by arguing during summation that Dr. Nayan's testimony supported the conclusion that Beltran committed the crimes charged, because he also had testified that V.'s injuries could have been sustained on a date much closer to her gynecological examination—a time period that Beltran was not in contact with her. (D.E. # 9 Ex. O at 3.) The trial court found Beltran's claim procedurally barred because it arose out of the trial record and should have been raised on direct appeal. (Id. at 4–5.) It further found that, in any event, it was meritless because the jury was aware that the medical testimony was not entirely conclusive. (Id.) On June 23, 2015, the Appellate Division denied Beltran's appeal. (Dolan Aff. ¶ 52.) On September 11, 2015, the New York Court of Appeals denied Beltran leave to appeal the order of the Appellate Division. (Id.)

On December 14, 2015, Beltran commenced this action seeking a writ of habeas corpus. His petition makes the following claims: (1) Friedman was ineffective because he: (a) failed to call a psychological expert; (b) failed to call a medical expert; (c) failed to call Beltran's wife to testify;

and (d) elicited damaging testimony of uncharged crimes when cross-examining M.; (2) he was denied a fair trial because: (a) the trial court failed to provide adequate assistance for his hearing impairment; (b) the prosecutor used enlarged photos of V., one of which included V.'s sister; and (c) the prosecutor misrepresented Dr. Nayan's testimony to the jury; (3) his Sixth Amendment Confrontation Clause rights were violated because the trial court allowed S. to testify via closed-circuit television; and (4) his due process rights were violated because the trial court did not declare a mistrial after S. became very emotional on the witness stand. (See Petition at 1–25.)

On September 15, 2016, Respondent opposed the petition. (D.E. # 8 ("Opp").) Rather than reply to the Respondent's brief, Beltran moved for additional discovery relating to his ineffective assistance of counsel and fair trial claims. (See D.E. # 13.)

On March 5, 2018, Beltran's request for additional discovery was denied. (D.E. # 14.) Beltran filed a letter in reply in which he requested an evidentiary hearing regarding his hearing impairment claim. (D.E. # 16.) Respondent opposed the hearing in a letter filed the same day, arguing that the claim is both procedurally barred and meritless. (D.E. # 15.) Beltran then filed two additional letters with the Court in support of his request for an evidentiary hearing. (D.E. # 17, 18.)

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment may only be brought on the grounds that his custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner must show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or is "based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013); Lafler v. Cooper, 566 U.S. 156, 172–73 (2012). This is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). As the Supreme Court has stated, "[w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam).

For the purposes of federal habeas review, "clearly established law" is defined as the "the holdings, as opposed to dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); Woods, 135 S. Ct. at 1376. A state court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. Williams, 529 U.S. at 412–13. The state court decision at issue must be "more than incorrect or erroneous," it must be "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

Federal habeas review is limited to determining whether a petitioner's custody violates federal law, see 28 U.S.C. § 2254(a), and "does not lie for errors of state law." Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (internal citations and quotations omitted). In addition, factual determinations made by the state court are presumed to be correct, and the petitioner bears the

burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

An application for a writ of habeas corpus on behalf of a person in state custody shall not be granted "unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). "State remedies are deemed exhausted when a petitioner has 'presented the federal constitutional claim asserted in the petition to the highest state court . . . and informed that court (and lower courts) about both the factual and legal bases for the federal claim.'" King v. Demarco, No. 11–CV–2000 (JS), 2011 WL 3471548, at *1 (E.D.N.Y. Aug. 3, 2011) (quoting Ramirez v. Att'y Gen. of N.Y., 280 F.3d 87, 94 (2d Cir. 2001)). "Therefore, until the highest state court has had an opportunity to consider and, if necessary, correct alleged violations of federal rights, a federal writ of habeas corpus will be granted only in 'special circumstances requiring immediate action.'" Id. (quoting Baldwin v. Reese, 541 U.S. 27, 29 (2004)).

## DISCUSSION

### I.    Ineffective Assistance of Counsel

Beltran contends that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments because Friedman: (1) failed to call a psychological expert; (2) failed to call a medical expert; (3) failed to call Beltran's wife to testify; and (4) elicited damaging testimony of uncharged allegations of sexual assault from M.

### A. Exhaustion

The first three of Beltran's arguments, relating to Friedman's failure to call experts or Beltran's wife, are fully exhausted. Beltran raised these claims in a § 440.10 motion on December

3, 2010. (Dolan Aff. ¶ 13.) After a hearing, the trial court determined that Beltran failed to establish that Friedman provided ineffective assistance of counsel on these grounds. (D.E. # 9 Ex. H ("440.10 Decision").) Beltran was denied leave to appeal this ruling on June 11, 2012. People v. Beltran, No. 2012-03477 (2d Dep't June 11, 2012).

Beltran's fourth argument is similarly exhausted. On direct appeal, Beltran argued in his pro se supplemental brief that Friedman was ineffective because during his cross-examination of M., he elicited that Beltran had "molested" her when she was younger. (D.E. # 9 Ex. K.) The Appellate Division made no specific reference to this argument but stated that: (1) Beltran's "claims of ineffective assistance of counsel [we]re not properly before th[e] Court, as they involve matter dehors of the record," and (2) that Beltran's "remaining contentions, including those raised in his pro se supplemental brief, [we]re without merit." People v. Beltran, 110 A.D.3d 153, 163 (2d Dep't 2013). Beltran was denied leave to appeal this ruling on June 10, 2014. People v. Beltran, 23 N.Y. 3d 1018 (2014). Beltran did not present this argument in his initial, pre-appeal § 440.10 motion to vacate judgment, nor in his post-appeal § 440.10 motion. Because this particular ineffective assistance of counsel argument is not "dehors of the record," the Court presumes that the Appellate Division dismissed it because it found it to be "without merit." The claim is therefore fully exhausted, because bringing this claim again in a § 440.10 motion would have been futile. See N.Y. C.P.L. § 440.10(2)(a) ("Notwithstanding the provisions of subdivision one, the court must deny a motion to vacate a judgment when . . . [t]he ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue"); see also Ramirez, 280 F.3d at 89 ("Because New York procedural rules bar petitioner from raising these claims now . . . because they have been litigated, see N.Y.

Crim. P.L. § 440.10(2)(a) . . . they are deemed to have been exhausted for purposes of 28 U.S.C. § 2254(b), (c)").

The Court will therefore evaluate the merits of each of Beltran's ineffective assistance of counsel claims.

### B. Merits

Under the standard promulgated by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), a petitioner is required to demonstrate two elements to successfully state a claim for ineffective assistance of counsel: (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 688, 694.

The first prong of the <u>Strickland</u> standard requires a showing that counsel's performance was constitutionally deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" <u>Greiner v. Wells</u>, 417 F. 3d 305, 319 (2d Cir. 2005) (quoting <u>Strickland</u>, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." <u>Id.</u> at 319 (quoting <u>Rompilla v. Beard</u>, 545 U.S. 374, 408 (2005) (O'Connor, J., concurring)). "In assessing performance, [a court] must apply a 'heavy measure of deference to counsel's judgments.'" <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 691).

This deferential standard given to counsel's representation must be considered "in tandem" with the deference accorded to state court decisions under § 2254. <u>Harrington v. Richter</u>, 562 U.S.

86, 105 (2011). Because each standard alone is "highly deferential," "when the two apply in tandem, review is doubly so." Id. (internal citations and quotation marks omitted); see also Jackson v. Conway, 763 F.3d 115, 123 (2d Cir. 2015) ("When evaluating an ineffective assistance claim under § 2254(d), our review is doubly deferential in that we take a highly deferential look at counsel's performance through the deferential lens of § 2254(d).") (internal quotations and alterations omitted). The Supreme Court has cautioned that "[f]ederal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 562 U.S. at 105.

### 1. Failure to Call Expert Witnesses

Beltran claims that Friedman was ineffective because he failed to call expert witnesses to rebut the expert testimony of Dr. Nayan and Dr. Lewittes. (Petition at 5–8.) Specifically, he contends that expert testimony was required to rebut Dr. Nayan's testimony about tears to V.'s vagina and hymen and Dr. Lewittes' testimony about child sexual abuse syndrome. (Id.) After conducting a hearing where it heard from both Friedman and Dr. Medows, the trial court rejected the merits of these claims. It concluded that Friedman had "made an informed and professionally reasonable decision not to undertake a 'battle of experts' to undermine the People's experts, and, instead, effectively cross-examined them to bring out concessions that he later used in his summation." (440.10 Decision at 11.) This conclusion was based on Friedman's testimony and affidavit, where he averred that after he consulted with Dr. Medows, he was informed that the tears to V's hymen "could not be dated," and that V. "did not behave like a child that had been sexually abused," because she had "never shown an unwillingness to be alone with the defendant, and had

16

not told anyone about the alleged sexual abuse for seven years." (Id. at 5.) Friedman chose to rely on cross-examination of Dr. Nayan and Dr. Lewittes to establish this doubt. He reasoned that if he had called a defense expert, it would have allowed the prosecution to "reiterate and highlight their evidence during cross-examination of the defense doctor and/or allow the prosecution to call an additional expert on rebuttal, effectively neutralizing any reasonable doubt created by [his] initial cross examination." (D.E. # 9 Ex. C ("Friedman Aff.") ¶ 7.) In Friedman's experience, entering a "battle of the experts" was ill advised—he believed that in such a contest, "defendants often lose." Id.

Under the "doubly deferential" standard of a Strickland claim in the context of a § 2254 petition, the state court reasonably found that Friedman was not ineffective. Friedman's decision to rely upon cross-examination of Dr. Nayan and Dr. Lewittes and not call defense experts was a reasonable trial strategy. "Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." Harrington, 562 U.S. at 111. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." Id. Beltran's argument therefore fails to satisfy the first prong of the Strickland test. See, e.g., Swaby v. New York, 613 F. App'x 48, 50–51 (2d Cir. 2015) ("the failure to seek an expert does not satisfy the performance prong of Strickland where counsel chooses a strategy that does not require an expert"); Pierre v. Ercole, 580 F. App'x 81, 83 (2d Cir. 2014) (trial counsel reasonably pursued the "strategic choice" of cross-examining a prosecution expert in a murder case in order "to avoid exposing his own witness to potentially effective cross-examination that could dilute the force of the points established during the cross-examination [of the state's expert witness]);

Hamilton v. Lee, 94 F. Supp. 3d 460, 479 (E.D.N.Y 2015) ("In many cases, cross-examining the prosecution's expert will be just as effective as, and less risky than, utilizing a rebuttal expert.") (internal citations omitted).

## 2. Failure to Call Beltran's Wife

Beltran next argues that Friedman was ineffective for failing to call his wife as a defense witness. (Petition at 18.) At Beltran's § 440.10 hearing, the trial court noted that "the defense did not call [Beltran's] wife to provide the testimony that the defense motion claimed trial counsel should have elicited from her during trial." (440.10 Decision at 8.) The court determined this was a "conscious choice made by the defense," because Beltran's wife "was present in the courthouse." (Id.) Moreover, it stated that there "was no reference to this claim in the post-hearing submission made by the defense." (Id.) The state court therefore deemed this portion of Beltran's ineffective assistance claim "abandoned." (Id.) For this reason alone, Beltran is foreclosed from advancing Friedman's failure to call his wife as grounds for an ineffective assistance claim. See Nieves-Andino v. Conway, No. 08-CV-5887 (NRB), 2010 WL 1685970, at *12 (S.D.N.Y. Apr. 20, 2010) ("because allegations of what a witness would have testified are largely speculative, habeas claims based on uncalled witnesses are disfavored") (internal quotations omitted).

In any event, Friedman explained why he did not call Beltran's wife. After meeting her "several times," Friedman concluded that she would not have been a "strong witness" for the defense. (Friedman Aff. ¶ 9.) Friedman determined that Beltran's wife "appeared somewhat emotionally unstable, would have been viewed as an interested witness ‚by the jury, and was initially supportive of the prosecution." (Id.) Beltran's wife was V.'s aunt, and accompanied V.'s mother—her sister—to the police precinct when the abuse was reported, and "was interviewed by detectives and the district attorney's office." (Id.) Friedman determined "as a matter of trial

strategy" that he should not have called Beltran's wife to testify, because if he had, she "could have legitimately [been] exposed [] to cross-examination with prior inconsistent statements and would have opened the door to the elicitation of prior domestic violence incidents involving [Beltran]." (Id.)

Friedman's decision to refrain from calling a witness is a matter of trial strategy that a reviewing court is "ill-suited to second guess." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). "A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel." United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002); see also United States v. DeJesus, 57 F. App'x 474, 478 (2d Cir. 2003) ("A trial counsel's decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed.") (internal citations omitted). Accordingly, Beltran's argument is without merit.

### 3. Eliciting Damaging Testimony from M. on Cross-Examination

Finally, Beltran argues that Friedman was ineffective because when cross-examining M., S's mother, he elicited allegations of uncharged sexual conduct. Specifically, M. testified that she allowed Beltran to babysit her children even though he had "molested her when she was younger." (Dolan Aff. ¶ 6-S.) M. explained that when she was ten or eleven, Beltran inappropriately touched her, and that she "tried to forget about her abuse but that everything came back to her after S.'s disclosure." (Id.)

This exchange between Friedman and M. was neither so unreasonable nor so prejudicial to meet either prong of Strickland. On the first prong, it can be inferred that Friedman elicited this

information as part of trial strategy. The line of inquiry sought to cast doubt on Beltran's opportunity to commit the crimes charged—it would not make sense that M. would leave her daughter with a man who had sexually abused her in the past. Consistent with this argument, Friedman also elicited that M. did not seek to keep other young female members of the family away from Beltran during the several weeks after she learned of the abuse of her daughter but had yet to report it. (Trial Tr: M. at 63–64; 66–69.) Friedman sought to undermine M.'s credibility and support a theory of defense that established that the allegations of sexual abuse were fabricated. The Second Circuit, "in case after case" has "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised." Tippins v. Walker, 77 F. 3d 682, 686 (2d Cir. 1996) (collecting cases). Friedman's cross-examination did not rise to the level of ineffective assistance of counsel.

Moreover, Beltran cannot meet the prejudice prong of Strickland—he does not make a showing that but-for this purportedly deficient performance in adducing M.'s testimony, there was a reasonable probability that the outcome of the trial would have been different. Id. at 694. In this context, "reasonable probability" means that the errors were of a magnitude such that they "undermine[ ] confidence in the [proceeding's] outcome." Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Henry v. Poole, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 695). Beltran's failure to make any showing in this regard further precludes his ability to secure relief.

\*     \*     \*

In sum, none of Beltran's arguments as to Friedman's representation demonstrate ineffective assistance of counsel. This is particularly true given the "doubly deferential" standard applied to the arguments previously raised and rejected by the state court. Beltran is not entitled to habeas relief on this claim.

## II.   Beltran's Hearing Impairment Claim and Request for Evidentiary Hearing

Beltran argues that the trial court denied him a fair trial when it failed to provide him with adequate assistance for his hearing impairment. (Petition at 10.) He additionally requests an evidentiary hearing related to this argument. (See D.E. # 17.) The Court denies the evidentiary hearing and dismisses his hearing impairment claim.

### A. Exhaustion

Beltran raises this issue in the context of a fair trial claim for the first time in the instant habeas petition. During his state court proceedings he referred to his hearing impairment claim as an issue of ineffective assistance of counsel, not fair trial. (Petition at 3.) Because he did not bring a fair trial claim in state court, the claim as it is currently presented is unexhausted and barred from federal habeas review. See O'Sullivan v. Boerckel, 526 U.S. 838, 841–42 (1999).

However, given Beltran's pro se status, the Court will construe his claim one of ineffective assistance of counsel. In his habeas petition, Beltran himself stated that he raised this claim on direct appeal as an ineffective assistance of counsel claim and mentions that Friedman failed to alert the trial court to his hearing impairment. (Petition at 11–12.) The history of the claim also suggests that he perhaps intended to bring it in the instant petition as one of ineffective assistance of counsel. Given the history of the claim and Beltran's own language in his petition, the Court will construe Beltran's argument as an ineffective assistance of counsel claim.

Beltran's ineffective assistance of counsel claim remains unexhausted. He raised it for the first time in his § 330.30 motion to set aside the verdict and then again on direct appeal. (Dolan Aff. ¶ 26; Petition at 12.) He did not raise it in either of his § 440.10 motions. Because Beltran pointed to evidence contained both within the trial record and outside of it, the Appellate Division found the claim improperly raised on direct appeal. Beltran, 110 A.D.3d at 163 ("The defendant's claims of ineffective assistance of counsel are not properly before this Court, as they involve matters dehors the record."). New York State procedure required Beltran to have raised this claim in a § 440.10 motion. See People v. Evans, 16 N.Y.3d 571, 575 n.2 (2011). Beltran never did so. As such, the claim remains unexhausted and is precluded from federal habeas review.

"An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Accordingly, the Court proceeds to evaluate the merits.

### B. Merits

Although both unexhausted, the Court analyzes Beltran's hearing impairment claim under both a fair trial and ineffective assistance of counsel framework. Under either, the claim is meritless.

#### 1. Fair Trial

Under the Sixth and Fourteenth Amendments, a defendant has the right to participate in his own trial. This right encompasses reasonable accommodations for hearing loss that may impair a defendant's participation. U.S. v. Crandall, 748 F.3d 476, 481 (2d Cir. 2014). However, the right does not extend "to the elimination of all difficulties or impairments that may hinder a criminal defendant's capacity to perfectly comprehend, and participate in, court proceedings." Id. Courts have long held that "'[a] defendant is entitled to a fair trial but not a perfect one.'" Bruton v. U.S.,

391 U.S. 123, 135 (1968) (quoting Lutwak v. U.S., 344 U.S. 604, 619 (1953)). The right to hearing accommodations are limited to "those reasonable accommodations that are requested by the defendant before or during trial or the need for which is, or should reasonably be, clear or obvious to the district judge." Crandall, 748 F.3d at 481 (citing Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989) (Powell, J., retired and sitting by designation) ("To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate [language] translation would be an open invitation to abuse.").

Upon review of the record, the Court finds that the trial court made reasonable accommodations for Beltran's hearing impairment and he was not denied a fair trial. Prior to the beginning of trial, Friedman informed the trial court that Beltran had "a case of meningitis around 20 years ago" which caused "hearing loss," and that Beltran had problems hearing "even with the amplified speaker." (Dolan Aff. Ex. A ("Trial Tr.") at 4.) The trial judge noted that at that time that Beltran was not having trouble hearing him speak without the amplified speaker. (Id.) Beltran stated that "As long as people talk in a very strong—I'm okay." (Id.) The trial court indicated it would utilize a microphone for testimony, to which Beltran stated "Okay." (Id.) The trial court also told Beltran to let him know if he was having issues hearing during the proceeding. (Id. at 5.) Throughout trial, witnesses were instructed to speak into the microphone when Friedman indicated that Beltran could not hear the testimony. (See, e.g., Trial Tr. M: 52; V.: 155; Nayan: 293.) On one occasion on the third day of trial, Friedman notified the court that Beltran had realized, upon reviewing the transcripts, that he did not fully comprehend the prior day's testimony. (Id. at 291.) Friedman noted that he would indicate to the court if there were any further issues. No subsequent applications were made. When considering Beltran's § 330.30 motion on the issue prior to sentencing, the trial court stated:

It should be noted that it was [sic] with respect to the defendant's claim of hearing impairment, this issue was raised and accommodated by the Court many times during the proceedings, both on and off the record.

Each time defendant indicated that he was having difficulty hearing the proceedings, the dialogue in question was repeated or reread. It appeared, that at all times, the defendant was satisfied with the Court's attempts to accommodate his hearing issue.

It appeared to the Court that, absent some isolated incident, defendant heard and comprehended the proceeding and interacted with defense counsel based on the testimony or information elicited. The Court was able to watch that during the proceedings.

If there were additional instances where defendant was unable to hear, it was incumbent upon the defendant to bring it to the Court's attention.

(Sentencing Tr. at 5.)

Beltran did not notify the trial court of a "continuous inability to hear the proceedings, either before or during trial." Crandall, 748 F. 3d at 482–83. Having failed to do so, Beltran was "only entitled to accommodations insofar as his impairment was, or reasonably should have been, clear and obvious to the [trial] judge." Id. The degree of such accommodation "varies from case to case on a sliding scale," and the determination of the appropriate accommodation largely is at the discretion of the trial judge, who is in the room and has the opportunity to observe the needs of the defendant. Id. Here, the trial court consistently asked witnesses to speak into the microphone and had testimony re-read to the defendant when required. Contrary to Beltran's contentions, the trial court was not required to supply amplified speakers in the courtroom to satisfy his accommodation. The Second Circuit has held on similar facts that "repetition" of testimony, "instructing witnesses to speak louder," and "instructing defense counsel to notify [the Court] if [the defendant] was having difficulty" are accommodations that "more than adequately address[]" a defendant's hearing problems. Id. at 184.

Accordingly, Beltran is not entitled to habeas relief under a fair trial theory.

## 2. Ineffective Assistance of Counsel

Similarly, Beltran has failed to satisfy that Friedman performed "below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Beltran argues that Friedman failed to inform the court of the extent of his hearing impairment by not delivering his medical records to the court. (Petition at 10.) However, at a conference months before trial, Friedman informed the court of Beltran's hearing loss, and the trial court ensured that Beltran could hear in the courtroom. (Trial Tr.: 4.) Before jury selection began, Friedman informed the court again of Beltran's hearing loss and requested that the court ask prospective jurors to speak clearly into the microphone. (Trial Tr.: 7, 130–131.) After Beltran informed Friedman that he had been unable to hear some testimony, Friedman again asked that the court remind witnesses to speak clearly into the microphone. (Trial Tr.: 291.) The record does not reflect that Friedman's actions prejudiced Beltran's trial or deviated from the standard of reasonableness required.

\*　　\*　　\*

Because Beltran's hearing impairment claims are both unexhausted and meritless, he is not entitled to habeas relief.

## C. Request for a Hearing

Beltran also requests an evidentiary hearing to supplement the record for his hearing impairment claim. (D.E. # 17.) He argues that Friedman did not inform the trial court that he requested headphones before trial. Additionally, he claims that Friedman ignored him when he gave notice that he could not hear witness testimonies. (Id.) However, the "Supreme Court made clear in Pinholster that 'review under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.'" Riley v. Noeth, No. 9:15-cv-01340-JKS, 2018 WL 1033289, at \*6 (N.D.N.Y. Feb. 2, 2018) (quoting Pinholster, 131 S. Ct. at

1398). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Williams, 529 U.S. at 437. Accordingly, this Court will not grant Beltran an evidentiary hearing.

### III. Beltran's Remaining Fair Trial Claims

#### A. Admission of an Enlarged Photo

Beltran claims he was denied a fair trial when the prosecution was allowed to present two large, "poster sized" photos of V., including one with V.'s sister. (Petition at 14.) Beltran contends that these pictures created "enormous prejudice" and that outweighed "any slight probative value that it may have [had]." (Id.)

This claim is not cognizable on habeas review. The decision of whether to admit photographs into evidence constitutes an evidentiary ruling governed by state law. Whether a state court has properly applied state law is not an issue that is reviewable on habeas. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). A petitioner can obtain relief from a state court's error in an evidentiary ruling premised on state law only if it has deprived him of a fundamentally fair trial that implicates his Fourteenth Amendment due process rights. Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004). Only erroneously admitted evidence that was "crucial, critical, or highly significant" to the outcome of the trial will constitute a deprivation of a fundamentally fair trial. Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985). The photographs Beltran complains of in this case—photos of V. when she was five and eight years old—are not such evidence. The record does not substantiate a claim that the photos were so significant to alter the outcome of Beltran's trial. The weight of the evidence presented at trial was substantial. The

victim and expert testimony alone would have been sufficient to support Beltran's conviction. As such, Beltran's claim is without merit.

## B. Prosecutorial Misconduct

Beltran next alleges that his right to a fair trial was infringed upon because the prosecution misrepresented the results of V.'s medical examination to the jury on summation. (Petition at 16.) Specifically, he argues that Dr. Nayan's testimony could not support a conclusion that V.'s injuries could have been caused by repeated acts of forcible intercourse years before the examination took place. (Id.)

The state court dismissed this claim during Beltran's second § 440.10 motion. Specifically, it stated that:

> First, the defendant's claims are entirely based on the trial record, and thus, the unjustifiable failure to raise them on direct appeal precludes their review on this motion. C.P.L. § 440.10(2)(c). Dr. Nayan's testimony and conclusions, as well as the prosecutor's purportedly improper comments thereon, were all part of the trial record. Thus they cannot now be reviewed as a substitute for direct appeal . . . . The present claim, unlike the claim on the prior motion, is not based on a claim of ineffective assistance of trial counsel for failing to properly cross-examine Dr. Nayan . . . Rather, the present claim is based purely on trial testimony and the prosecutor's on-the-record comments and not on any evidence introduced at the hearing on the defendant's prior CPL 440.10 motion.

The state court dismissed Beltran's claim as procedurally defaulted based on a state law procedural bar, N.Y. C.P.L. § 440.10(2)(c).

It is well established that a federal court cannot address the merits of a habeas claim that a state court rejected based on "a state law ground that is independent of the Federal question and adequate to support the judgment, regardless of whether the state law ground is substantive or procedural." Lee v. Kemp, 534 U.S. 362, 375 (2002) (quotations omitted). A procedural rule is considered "adequate" if it is "firmly established and regularly followed by the state in question." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999). To be "independent," the "state court must

actually have relied on the procedural bar as an independent basis for its disposition of the case" by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 261–62, 263 (1989) (internal quotations omitted).

The determination by the state court that Beltran's claim was procedurally barred meets these requirements. First, the procedural bar contained in N.Y. C.P.L. § 440.10(2)(c) is firmly established and regularly followed in the state's courts. The Second Circuit and courts in this district have frequently found that a New York state court's reliance on § 440.10(2)(c) constitutes a procedural bar to federal habeas relief. See, e.g., Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2001); Davis v. Walsh, No. 08-CV-4659 (PKC), 2015 WL 1809048, at *9–*10 (E.D.N.Y. Apr. 21, 2015) (citing People v. Washington, 836 N.Y.S.2d 488 at *2 (Sup. Ct. 2006)). Second, the state court expressly relied upon § 440.10(2)(c) when denying Beltran's claim in the motion to vacate his conviction.

Once it has been determined that a claim is procedurally barred under state procedural rules, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). Beltran fails to establish cause and prejudice or a fundamental miscarriage of justice. "Cause may be demonstrated with a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by state officials' made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel." Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (internal quotations omitted). Here, Beltran's claim involves remarks made during the prosecution's summation—items clearly on the record and readily available to appellate counsel, who did not

raise the claim on direct review. Beltran also has not argued that his appellate counsel was ineffective. Beltran also does not set forth any basis to conclude that a miscarriage of justice would occur were the Court not to review his claim on the merits. See St. Helen v. Senkowski, 374 F.3d 181, 184 (2d Cir. 2004) ("In the case of procedural default (including where an unexhausted claim no longer can proceed in state court), we may reach the merits of the claim 'only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent.'") (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)). Accordingly, there is no good cause to excuse Beltran's failures, and the Court is barred from reaching the merits of this claim.

### IV.    Confrontation Clause

Beltran argues that the trial court violated his Confrontation Clause rights by allowing S. to testify via a two-way closed-circuit television after determining that she was a "vulnerable witness" as defined by N.Y. C.P.L. Article 65. Beltran first raised this issue on direct appeal, and the Second Department issued an extensive opinion rejecting his claim, relying on both New York and Federal law. People v. Beltran, 110 A.D.3d 153, 155–162 (2nd Dep't 2013).

Although the Confrontation Clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact," Coy v. Iowa, 487 U.S. 1012, 1016 (1988), the right to such a confrontation is "not absolute," United States v. Gigante, 166 F.3d 75, 80 (2d Cir. 1999) (citing Maryland v. Craig, 497 U.S. 836, 851 (1990)). In Maryland v. Craig, the Supreme Court held that the "use of the one-way closed-circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." 497 U.S. at 851. The Supreme Court explained that "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure

that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." Id. at 855. Courts in this Circuit have accordingly dismissed § 2254 Confrontation Clause challenges to the use of a closed-circuit television to facilitate child witness testimony in sexual abuse cases. See, e.g., Martin v. Lord, 378 F. Supp. 2d 184, 187–88 (W.D.N.Y. 2005) (finding that the state trial court "was well within its discretion" to allow the victim's testimony to be presented to the jury via closed-circuit television when the victim "was only eight-years-old at the time of trial," and there had been no attempt to rebut the premise that the victim "would have been likely to suffer 'severe' mental and emotional harm if required to testify"); Paramore v. Filion, 293 F. Supp. 2d 285, 293 (S.D.N.Y. 2003) ("when a rational trier of fact deems a sexually abused child to be 'vulnerable,' a motion may be granted authorizing the child to testify via closed circuit television, which is a qualified exception to the Sixth Amendment's confrontation clause requiring defendants to face their accusers"); Jelinek v. Costello, 247 F. Supp. 2d 212, 295 (E.D.N.Y. 2003) (holding that a state court's decision to use a two-way, closed circuit television during testimony of a child witness was reasonable).

In this case, prior to permitting S. to testify via a two-way closed-circuit television, the trial court held a hearing to determine whether S. was a "vulnerable witness." Testimony was taken from "a social worker who had met with the child on at least five prior occasions," who averred that it was her "professional assessment" that S. would suffer "severe mental or emotional harm by testifying in open court." Beltran, 110 A.D.3d at 156. The trial court also determined that from its "vantage point on the bench approximately three feet from where the witness was seated, it was clear that [S.] was in severe emotional distress and appeared terrified." Id. It then permitted testimony to be taken from "a two-way feed" where the "jury will be able to see her testifying, and . . . she will be able to see the complete courtroom." Id. The Appellate Division affirmed,

determining that "[t]he evidence established the likelihood that the child would suffer severe mental or emotional harm if required to testify in the defendant's presence," and that because S. "testified by way of two-way closed circuit television, so that she could see [Beltran] during her testimony, and [Beltran] can see her," Beltran's Sixth Amendment Confrontation Clause rights were not violated. Id. at 162. This decision was not "contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent, nor was it "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Therefore, habeas relief is not warranted.

## V.    Due Process Claim

Beltran's final claim is that his due process rights were violated when the trial court "refus[ed] to declare a mistrial after [S.] . . . was unable to testify in open court because of uncontrollable crying." (Petition at 24.) Beltran claims that he was prejudiced because the jury saw S. was "so distraught," and "overwhelmed to the point where she was just crying and . . . could not respond." (Id. at 25.) Although Friedman moved for a mistrial, the trial court denied his application and instead allowed S. to testify via closed-circuit television. During jury instructions, the trial court instructed the jury that its verdict must be based on the "evidence alone" and that it may not be "affected by sympathy or other considerations outside of the evidence." (Trial Tr: 532.) Beltran raised this claim on direct appeal. The Appellate Division dismissed it summarily in its statement that Beltran's "remaining contentions . . . are without merit." People v. Beltran, 110 A.D.3d at 163.

"[A] trial court's determination of whether or not to declare a mistrial is accorded the 'highest degree of respect.'" Parham v. Griffin, 86 F. Supp. 3d 161, 174 (E.D.N.Y. 2015) (quoting Arizona v. Washington, 434 U.S. 497, 511, (1978)). Due process is only violated by the

presentation of improper evidence to the jury where the "type of evidence is so extremely unfair that its admission violates fundamental conceptions of justice." Dowling v. United States, 493 U.S. 342, 352, (1990) (internal quotation omitted). "Emotional outbursts by witnesses are generally not found to meet this standard." Heath v. Laballey, No. 11-CV-2962 (ERK), 2014 WL 4954658, at *2 (E.D.N.Y. Oct. 2, 2014) (finding no due process violation when the trial court refused to grant a mistrial after a witness said "Stop it. Stop it. Stop it. I can't." and began crying "very loudly") (citing Forte v. LaClair, No. 07-CV-2533 (DLC), 2008 WL 4178143, at *4 (S.D.N.Y. Sept. 5, 2008)); Morris v. Phillips, No. 04–CV–4597 (FB), 2006 WL 3694545, at *4 (E.D.N.Y. Dec. 13, 2006)). Moreover, any possible prejudice that S.'s crying may have caused would have been corrected by the trial court's jury instruction that directed the jury not to allow sympathy to interfere with its judgment. See Richardson v. Marsh, 481 U.S. 200, 206 (1987) ("This accords with the almost invariable assumption of the law that jurors follow their instructions, which we have applied in many varying contexts.") (internal citations omitted); see also Heath, 2014 WL 4954658, at *2 (denying relief when "witness outbursts" were followed by curative jury instructions). Beltran is accordingly not entitled to habeas relief on this ground.

## CONCLUSION

For the reasons stated above, Beltran's habeas petition and request for an evidentiary hearing are both denied. Because Beltran has not made a substantial showing of the denial of a constitutional right, the Court denies the issuance of a certificate of appealability. 28 U.S.C. § 2253. The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

Dated: May 24, 2019
Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge